**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ARNOLD VARGAS AND JARED CHARLAP,<br><br>Plaintiffs,<br><br>v.<br><br>NATIVE INSTRUMENTS USA, INC., DBA IZOTOPE,<br><br>Defendant. | Civil Action No. 2:25-cv-00164<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND PROSPECTIVE INJUNCTIVE RELIEF

ARNOLD VARGAS and JARED CHARLAP ("Plaintiffs"), by and through undersigned counsel, seek a permanent injunction requiring a change in NATIVE INSTRUMENTS USA, INC., DBA IZOTOPE's ("Izotope" or "Defendant") corporate policies to cause its digital properties to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiffs respectfully assert as follows:

## INTRODUCTION

1.      This action arises from Defendant's failure to make its digital properties accessible to legally blind individuals, which violates the effective communication and equal access requirements of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189.

2.      It is estimated that 2.5 percent of the American population lives with some sort of visual disability. *See* Erickson, W., Lee, C., von Schrader, S., Disability Statistics from the American Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI), *available at* https://www.disabilitystatistics.org/acs/1 (last accessed February 4, 2025).

1

3.      For this significant portion of Americans, accessing digital platforms, mobile applications, and other information via their computers and smartphones has become critical, especially in the post-pandemic era. Since the pandemic, U.S. e-commerce has continued to grow, with 12 million new users choosing to shop online since 2020.[1] According to a recent study, e-commerce increased by 25% from $516 billion (11.1% of total retail sales) to $644 billion (14.2% of total retail sales).[2] This underscores the importance of access to online retailers.

4.      During these challenging times, disabled individuals rely heavily on acquiring goods and services from the internet. With more businesses choosing to market their goods and services on their online platform, access to the website is vital. Sir Tim Berners-Lee, the founder of the World Wide Web, wrote, "The power of WWW is in its universality. Access by everyone regardless of disability is an essential aspect."[3]

5.      At the same time, the share of Americans who own smartphones has climbed from just 35% in 2011 to 81% in 2019—amounting to more than 265 million people in the United States. *See* U.S. Census Bureau, U.S and World Population Clock, *available at* https://www.census.gov/popclock/ (last accessed February 4, 2025) (U.S. population on September 18, 2023 was 325.4 million).

6.      In this climate, it is especially important to consider factors that can facilitate or impede technology adoption and use by people with disabilities. National Council on Disability,

---

[1] *See* Statista, Number of users of e-commerce in the U.S. 2018-2027, available at https://www.statista.com/statistics/273957/number-of-digital-buyers-in-the-united-states/ (last accessed February 4, 2025).
[2] *See* National Library of Medicine, *Online shopping continuance after COVID-19, available at https*://www.ncbi.nlm.nih.gov/pmc/articles/PMC9379614/ (last accessed February 4, 2025).
[3] *See* Forbes, *Covid Reminds Us That Web Accessibility Helps All Users, Not Just The Disabled, available at* https://www.forbes.com/sites/gusalexiou/2020/08/23/covid-reminds-us-that-web-accessibility-helps-all-users-not-just-the-disabled/?sh=6b67ed7a6df1 (last accessed February 4, 2025).

*National   Disability   Policy:   A   Progress   Report* (Oct.   7,   2016),   *available   at* https://www.ncd.gov/report/national-disability-policy-a-progress-report-october-2016/      (last accessed February 4, 2025).

7.      Properly formatted, digital content is universally accessible to everyone. But when it is not, ineffective communication results. In those situations, legally blind individuals must unnecessarily expend additional time and effort to overcome communication barriers sighted users do not confront. These barriers may require the assistance of third parties or, in some cases, may deny outright access to the online service.

8.      Screen access "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use digital platforms. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a digital platform by listening and responding with his keyboard.

*Id*. at *6-7.[4]

---

[4]      *See* American Foundation for the Blind, *Screen Readers*, *available at* https://www.afb.org/node/16207/screen-readers (last accessed February 4, 2025) (discussing screen readers and how they work).

9.    As an increasingly common—albeit ineffective—measure is the use of accessibility overlays. These "third party scripts. . . try to detect and fix accessibility problems through AI or machine learning, taking a guess at the high-level tags and attributes, and then injecting code to fix things like adding alt attributes." American Foundation for the Blind, *Accessibility Overlays: Promises and Pitfalls*, available at https://www.afb.org/blog/entry/accessibility-overlay-promises-and-pitfalls (last accessed February 4, 2025).

10.    Accessibility overlays purport to "guarantee that your website will be 100% ADA and WCAG 2.1 compliant" but "often miss more than 70% of WCAG guidelines which can only be assessed through manual testing." *Id.*

11.    Even more concerning is that, although these overlays promise a "quick fix," they will "often override the settings of users' existing assistive technology software, which makes things more difficult and complicated for the [screen reader] user." *Id.*

12.    Unfortunately, here Defendant fails to communicate effectively with Plaintiffs because its digital properties are not properly formatted to allow legally blind users such as Plaintiffs to access its digital content. Accordingly, legally blind customers such as Plaintiffs are deprived from accessing information about Defendant's products and using its online services, all of which are readily available to sighted customers.

13.    The United States Department of Justice Civil Rights Division has provided "Guidance on Web Accessibility and the ADA."[5] It states in part, "the Department has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web."

---

[5]    See ADA.Gov, *Guidance on Web Accessibility and the ADA*, *available at* https://www.ada.gov/resources/web-guidance/    (last accessed February 4, 2025) ("DOJ Guidance").

14.     This lawsuit is aimed at providing legally blind users like Mr. Vargas and Mr. Charlap a full and equal experience.

## PARTIES

15.     Plaintiff Arnold Vargas is, and at all times relevant hereto has been, legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101et seq. Plaintiff has a hereditary condition called Leber Congenital Amaurosis, an eye disorder that primarily affects the retina and causes severe visual impairment beginning in infancy. Plaintiff uses screen readers, including the built-in Voiceover capability of his iPhone 6s and MacBook Pro, combined with Zoom software, to navigate the internet. Plaintiff Vargas is, and at all times relevant hereto has been, a resident of Roxbury, Massachusetts.

16.     Plaintiff Charlap is, and at all times relevant hereto has been, a resident of Allegheny County, Pennsylvania. Plaintiff Charlap is legally blind. He was born with Ocular Albinism, a condition that affects the development of the eyes. In Plaintiff Charlap's case, the condition resulted in underdeveloped retinas causing blindness. He uses ZoomText to navigate the internet. Plaintiff Charlap is, and at all times relevant hereto has been, legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101et seq.

17.     Defendant is a Massachusetts corporation with its principal place of business located at 2 Avenue De Lafayette, Boston, Massachusetts 02111. Defendant is a leader in the design, development, manufacture, and distribution of audio recording products under its recognized brand name Izotope.

18.    Consumers may purchase Defendant's products and access other brand-related content and services at https://www.izotope.com/en  ("Digital Platform"), the Digital Platform Defendant owns, operates, and controls.

19.    In addition to researching and purchasing Defendant's products and services from the comfort and convenience of their homes, consumers may also use Defendant's Digital Platform to contact customer service by email, sign up to receive product updates, product news, and special promotions, review important legal notices like Defendant's Terms of Use, Privacy Policy, and more.[6]

20.    Defendant is responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance.

21.    Because Defendant's Digital Platform is not and has never been fully accessible, and because upon information and belief Defendant does not have, and has never had, adequate corporate policies that are reasonably calculated to cause its digital properties to become and remain accessible, Plaintiffs invoke 42 U.S.C. § 12188(a)(2) and seek prospective injunctive relief requiring Defendant to:

a)    Retain a qualified consultant acceptable to Plaintiffs ("Web Accessibility Consultant") who shall assist in improving the accessibility of its Digital Platform, including all third-party content and plug-ins, so the goods and services on the Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities;

b)    Work with the Web Accessibility Consultant to ensure all employees involved in Digital Platform and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

c)    Work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Defendant's Digital Platform may be

---

[6]    *See, e.g.*, Defendant's Home Page, *available at* https://www.izotope.com/en.

equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

d) Work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on Digital Platforms, in addition to the testing, if applicable, that is performed using semi-automated tools;

e) Incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f) Work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Digital Platform, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems;

g) Directly link from the footer on each page of its Digital Platform, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Digital Platform to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Digital Platform;

h) Accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i) Provide a notice, prominently and directly linked from the footer on each page of its Digital Platform, soliciting feedback from visitors to the Digital Platform on how the accessibility of the Digital Platform can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j) Provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Digital Platform;

k) Train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Digital Platform. Defendant shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l) Modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Digital Platform to be inaccessible to users of screen reader technology;

m) Plaintiffs, their counsel, and their experts monitor the Digital Platform for up to two years after the Mutually Agreed Upon Consultant validates the Digital Platform is free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiffs, through their counsel and their experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Digital Platform Accessibility Consultant provides Defendant.

22.     Digital platforms have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible digital platform will not cause the digital platform to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible digital platform has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the digital platform to remain accessible, the digital platform must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

23.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

24.     Defendant participates in the Commonwealth's economic life by performing business over the Internet. Through its Digital Platform, Defendant entered into contracts for the sale of its products and services with residents of Pennsylvania. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Suchenko v. ECCO USA, Inc.*, No. 18cv0562, 2018 U.S. Dist. LEXIS 129862 (W.D. Pa. Aug. 2, 2018); *Gniewkowski v. Lettuce Entertain You Enters.*, 251 F. Supp. 3d 908

(W.D. Pa. 2017); *Gathers v. N.Y. & Co.*, No. 16cv1375, 2017 U.S. Dist. LEXIS 11653 (W.D. Pa. Jan. 27, 2017).

25.     Plaintiffs were injured when they attempted to access Defendant's Digital Platform from their homes in Roxbury, Massachusetts, and in this District, respectively, in an effort to shop for Defendant's products but encountered barriers that denied them full and equal access to Defendant's online goods, content, and services. Plaintiff Vargas is a musician and had attempted to purchase the 'Mix & Master Bundle Advanced. Plaintiff Charlap had attempted to purchase the 'VEA (Voice Enhancement Assistant)' to aid with starting a podcast. Unfortunately, they were unable to complete their purchases due to the accessibility barriers which exist on Defendant's Digital Platform.

26.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred.

## FACTS APPLICABLE TO ALL CLAIMS

27.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, digital platform developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## DEFENDANT'S ONLINE CONTENT

28.     Defendant's Digital Platform allows consumers to research and participate in Defendant's services and products from the comfort and convenience of their own homes.

29.    The Digital Platform also enables consumers to contact customer service by email, sign up to receive product updates, product news, and special promotions, review important legal notices like Defendant's Terms of Use, Privacy Policy, and more.

30.    Consumers may use the Digital Platform to connect with Defendant on social media, using sites like X (formerly known as Twitter), Facebook, Instagram, and YouTube.

**DEFENDANT'S USE OF AN INEFFECTIVE ACCESSIBILITY OVERLAY**

31.    Defendant may intend to employ a low-cost, off-the-shelf accessibility overlay and/or widget (collectively "Overlay") to address the inaccessibility of its Digital Platform. Experts from across academia and industry alike agree, however, that overlays fall well short of providing a fully accessible experience to blind users like Plaintiff.

32.    First appearing in the late 1990s, accessibility overlay software generally applies a third-party source code which aims to improve the accessibility of websites by adding some accessibility tools, such as text-to-speech capabilities. These tools are designed to allow end-users better access to otherwise inaccessible digital platforms.

33.    As such, accessibility overlay software is little more than a band-aid which "tend[s] to provide superficial fixes that do not fundamentally address the core accessibility issues and often conflict with existing assistive technologies." *See*, e.g., Makati, et al., "The Promise and Pitfalls of Web Accessibility Overlays for Blind and Low Vision Users." *Proceedings of the 26th International ACM SIGACCESS Conference on Computers and Accessibility, available at* https://dl.acm.org/doi/10.1145/3663548.3675650 *(last accessed February 4, 2025*).

34.    These products are often misleadingly advertised with assurances of immediate and full compliance with ADA and WCAG standards, promising the physically disabled user full and

equal access to the digital platform. *See* Karl Groves et al., *Overlay Factsheet, available at* https://overlayfactsheet.com/en/ *(last accessed February 4, 2025*).

35.     However, website accessibility experts uniformly agree that these tools "at their best offer minimal (often redundant) tools and possible remediation of a small percentage of barriers." *See generally,* Law Office of Lainey Feingold, *Honor the ADA: Avoid Web Accessibility Quick-Fix Overlays, available at* https://www.lflegal.com/2020/08/quick-fix/#False-Promises-of-ADA-compliance *(last accessed February 4, 2025)*.

36.     Moreover, the use of Overlays tends to frustrate the accessibility of a website by:

    a.   creating unclear link text which prevents proper identification of link icons;

    b.   incorrectly designating heading order which prevents understanding of the page hierarchy;

    c.   improperly announcing styling of text; and

    d.   lacking form field labels or inadequate identifying them.

Creative Boost, *Overlays and Plugins Aren't the Answer to Accessibility, available at* https://creative-boost.com/overlays-and-plugins-arent-the-answer-to-accessibility/ *(last accessed February 4, 2025)*; *See also* Richard Hunt, *Is there a silver bullet for ADA website accessibility? Sorry, but the answer is no., available at* https://accessdefense.com/?p=5378#:~:text=ADA%20website%20accessibility%3F-,Sorry%2C%20but%20the%20answer%20is%20no.,in%20a%20footnote%20of%20sorts. *(last accessed February 4, 2025).*

37.     Even more concerning, some Overlays that automatically enable certain settings, such as those utilized by screen-reader and speech recognition users, may run afoul of consumer data privacy laws collecting personal data. In some cases, Overlays expose detail about the user's

disability, age, ethnic background, or preferred gender. *See* Karl Groves et al., *Overlay Factsheet,*

*available at* https://overlayfactsheet.com/en/ *(last accessed February 4, 2025*)

38.    These Overlays have been set to remain active across different websites through

setting of cookies on the user's device. "[T]he big privacy problem is that the user never opted in

to be tracked and there's also no ability to opt-out." *Id.*

39.    The Overlay Factsheet cited herein is a collective work of a wide range of

international website accessibility experts.  The more than 900 signatories to the factsheet include:

a.    Contributors and editors for WCAG, ARIA, and HTML specifications;

b.    Consultants from the United State, United Kingdom, Netherlands, Canada, Japan, Denmark, France, Serbia, Norway, Belgium, Poland, Australia, Germany, Israel, Chile, and more;

c.    Internal accessibility experts for companies such as Google, Microsoft, Apple, NBC, Squarespace, BBC, VMWare, Shopify, ServiceNow, Dell, Lyft, HCL, Costco, Expedia, eBay, Cigna, Target, CVS Health, Kijiji, Orange, Pearson, Mitre, Sapient, and Pearson Assessments;

d.    Internal accessibility experts from higher education institutions like Syracuse University, CSU, Stuttgart Media University, University of Massachusetts, San Francisco State University, Gallaudet University, Carnegie Mellon, West Virginia University, MIT;

e.    Lawyers for the disabled;

f.    Contributors to assistive technology software such as JAWS and NVDA; and

g.    Scores of end users with disabilities.

*Id.*

40.    Notable signatories to the factsheet include:

a.  Karl Groves, Founder and President, Tenon.io (a web accessibility testing platform that also does accessibility audits, consulting, development, and training in accessibility for Web, Mobile, Native Software, and Hardware);

b.  Lainey Feingold - lawyer and author, Law Office of Lainey Feingold (For twenty-seven years her principal work has been with the blind and visually impaired community on technology and information access issues, including web and mobile accessibility. She also consults with organizations about digital accessibility, is an author, and is a sought-after public speaker on issues of digital accessibility, collaborative problem solving, and best practices for building and advocating for an inclusive digital world);

c.  Dan Keck, CPWA, Senior Web Application Developer, The Ohio State University (Experience with data transformation, documentation, customer support, professional development, and accessibility testing. Certified Professional in Web Accessibility (CPWA));

d.  Michael Gower, Senior Consultant in Accessibility at IBM, Co-facilitator for WCAG 2 Task Force at W3C (Shares responsibility for the running of the WCAG 2 task force, which is responsible for maintaining the resilience of the 2.x versions Web Content Accessibility Guidelines. Oversee the process of addressing issues opened against the three Recommended versions: 2.0 (2008), 2.1 (2018) and 2.2 (2023))

e.  Eduardo Meza-Etienne, Director of Compliance and Accessibility Team Lead at eSSENTIAL Accessibility (Digital accessibility expert, diversity and inclusion, and business strategist. With a background in economics and international trade, his career expands to other areas that include business development, project management and accessibility.)

### A.    AccessiBe's Deceptive and Misleading Conduct

41.    The conduct of overlay providers has recently come under closer scrutiny. The Federal Trade Commission ("FTC") recently ordered overlay provider accessiBe to pay a civil fine of $1,000,000 and to engage in numerous remedial efforts to address its serially misleading conduct regarding its overlay product. *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-order-requires-online-marketer-pay-1-million-deceptive-claims-its-ai-product-could-make-websites *(last accessed February 4, 2025)*.

42.     AccessiBe marketed and sold its web accessibility plug-in under the name, accessWidget, falsely claiming to transform any website into a state of full compliance WCAG standards. These statements were materially false and misleading. accessiBe has now admitted that "accessWidget did not make all user websites WCAG-compliant and these claims were therefore false, misleading, or unsubstantiated, in violation of the FTC Act." *Id.*

43.     Pursuant to the recent FTC settlement and consent order, accessiBe is prohibited from:

> [R]epresenting that its automated products, including accessWidget's AI, can make any website WCAG-compliant or can ensure continued compliance with WCAG over time, unless it has the evidence to support such claims.

> [M]isrepresenting any material facts about its products and services to consumers regarding their features, performance, benefits and other qualities, and from misrepresenting that: 1) statements made in third-party reviews, blog posts, or articles about its automated products are independent opinions by impartial users; 2) an endorser is an independent or ordinary user of the automated product; or 3) an endorser is an independent organization providing objective information.

*Id.*

44.     While accessiBe may have been the first Overlay vendor to face consequences for its deceptive practices, these practices are common within the industry and "[o]verstating a product's AI or other capabilities without adequate evidence is deceptive, and the FTC will act to stop it." *Id.*

45.     Consistent with the FTC's position on the shortcomings of accessibility overlays, federal courts have repeatedly found widgets insufficient to provide a comprehensive solution to website accessibility. In *Quezada v. US Wings, Inc.*, 20 Civ. 10707 (ER), 2021 WL 5827437 (S.D.N.Y. Dec. 7, 2021), the court allowed competing declarations and the Defendant who relied upon the AccessiBe widget failed to meet burden to show mootness: "[t]he Court concludes that

U.S. Wings has not shown that they have undoubtedly fixed accessibility issues on their website as multiple barriers still allegedly exist." This is despite multiple audits from AccessiBe claiming 100% compliance. *See also Paguada v. Yieldstreet Inc.*, No. 20 CIV. 9254 (LGS), 2021 WL 4896278 (S.D.N.Y. Oct. 20, 2021) (finding the use of Userway plugin did not meet the "formidable burden" of making it "absolutely clear" that the alleged wrongful behavior was ceased or that it could not reasonably be expected to recur, therefore the issue was not moot); *Alcazar v. Bubba Gump Shrimp Co. Restaurants*, No. 20-CV-02771-DMR, 2020 WL 4601364 (N.D. Cal. Aug. 11, 2020) (finding the submission of competing evidence, including Defendant's submission of an audit report completed by AudioEye alleging full compliance with WCAG 2.1 standards, created a "genuine factual issue about whether the alleged barriers have been remedied").

46.     Moreover, in *Brooks v. Lola & Soto Business Group, Inc.,* the district court found that the Defendant's use of remediation in the form of an accessibility plugin does not make it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur. . . . [and] 'voluntary remediation efforts [that] are not structural in nature, and could easily reoccur despite Defendant's best intentions.'" No. 2:21-CV-00158-TLN-DB, 2022 WL 616798, *6 (E.D. Cal. Mar. 2, 2022) (internal citation omitted).

47.     Defendant's attempt to use an Overlay would be insufficient to provide blind users like Plaintiff an accessible Digital Platform.

## HARM TO PLAINTIFFS

48.     Plaintiffs attempted to access the Digital Platform from their homes in Roxbury, Massachusetts and Allegheny County, Pennsylvania, respectively, to purchase audio plugins. Unfortunately, because of Defendant's failure to build the Digital Platform in a manner that is compatible with screen access programs, Plaintiffs are unable to understand, and thus are denied the benefit of, much of the content and services they wish to access on the Digital Platform. The

following are illustrative (but, importantly, not exhaustive) examples of a few of the accessibility barriers observed on the Digital Platform:

   a. Several mislabeled or unlabeled elements exist on Defendant's Digital Platform. For example, when the screen-reader focus arrives on the 'Account' button, it is announced simply as "button." Each of the social media links at the bottom of the page are announced as "Izotopeinc, link." Furthermore, the 'Quantity' fields displayed on the cart webpage are not correctly labeled. When the screen-reader focus arrives on the 'Quantity' fields, they are announced as "(current number of items in the cart), popup button, double tap to activate the picker." For example, if there is one item in the cart, the announcement would be "1, popup button, double tap to activate the picker." Finally, the 'Google Pay' button displayed on the checkout page is simply announced as "button." The lack of descriptive labels prevents the screen-reader user from successfully comprehending the information present on Defendant's Digital Platform.





b.     When the 'Learn' webpage loads, a popup is displayed which offers "Free Plugins" when the user signs up for Defendant's email list. Unfortunately, the popup is not accessible to screen-reader users. For example, when the popup is displayed on screen, the screen-reader focus remains on the underlying page and that content is announced to the screen-reader user. The screen-reader focus never arrives on the popup and the content of the popup is not announced to the screen-reader user. As a result, the screen-reader user is unable to sign up for the email list and are unable to receive the "Free Plugins."



c.     Product help guides are available to assist users with their products. However, the help guides are not accessible to screen-reader users. For example, the guides contain several images with text. When the screen-reader focus arrives on images with text, the text is announced at once without providing any description of the corresponding image. Furthermore, product pages display a product comparison table. On the 'Ozone 11' product page, a table is displayed which shows the different features between the 'Ozone Elements,' 'Ozone Standard,' and 'Ozone Advanced' products. The header of the columns are labeled with the product names, and the rows show several different features. If a product contains a feature, a black dot is displayed in that row and column. However, this is not announced to the screen-reader user. When the screen-reader focus arrives on the table, the column and row headers are announced, but the black dots are not. The result prevents the screen-reader user from comprehending the information displayed in the table.





49.     These barriers, and others, deny Plaintiffs full and equal access to all of the services the Digital Platform offers, and now deter them from attempting to use the Digital Platform to buy Defendant's goods and services. Still, Plaintiffs would like to, and intends to, attempt to access the Digital Platform in the future to research the products and services the Digital Platform offers and/or to test the Digital Platform for compliance with the ADA.

50.     If the Digital Platform was accessible, *i.e.* if Defendant removed the access barriers, Plaintiffs could independently research and purchase Defendant's products and access its other online content and services.

51.     The law requires that Defendant reasonably accommodate Plaintiffs' disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

52.     Plaintiffs have been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

## SUBSTANTIVE VIOLATIONS

## FIRST CAUSE OF ACTION

## Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

53.    The assertions contained in the previous paragraphs are incorporated by reference.

54.    Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.

55.    Defendant is bound by the regulations implementing Title III of the ADA, which require that places of public accommodation ensure effective communication to individuals with disabilities. 28 C.F.R. § 303(c). *See also* DOJ Guidance (stating "[s]ince 1996, the Department of Justice has consistently taken the position that the ADA applies to web content.")

56.    Mr. Vargas and Mr. Charlap are legally blind and therefore are individuals with a disability under the ADA.

57.    Defendant is a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment." 42 U.S.C. § 12181(7)(E), (F).

58.    Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182; 28 C.F.R. §36.201.

59.    Defendant owns, operates, or maintains the Digital Platform.

60.    The Digital Platform is a service, facility, privilege, advantage, or accommodation of Defendant.

61.    Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. *See also* DOJ Guidance (explaining "[b]usinesses open to the

public must take steps to provide appropriate communication aids and services (often called "auxiliary aids and services") where necessary to make sure they effectively communicate with individuals with disabilities.")

62.    Specifically, "[e]ven though businesses and state and local governments have flexibility in how they comply with the ADA's general requirements of nondiscrimination and effective communication, they still must ensure that the programs, services, and goods that they provide to the public—including those provided online—are accessible to people with disabilities." DOJ Guidance.

## PRAYER FOR DECLARATORY JUDGMENT AND PROSPECTIVE INJUNCTIVE RELIEF

WHEREFORE, Plaintiffs pray for:

(A)    A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Digital Platform was fully accessible to, and independently usable by, individuals with visual disabilities;

(B)    A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Digital Platform into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Digital Platform is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law, including the specific prospective injunctive relief described more fully in paragraph 18 above.

(C)     Payment of costs of suit;

(D)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Access Now, Inc. v. LAX World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) (same);

(E)     Payment of nominal damages;

(F)     The provision of whatever other relief the Court deems just, equitable and appropriate; and

(G)     An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders in regard to the specific prospective injunctive relief described at paragraph 17 above.


Dated: February 4, 2025                    Respectfully Submitted,


                                           */s/ Benjamin J. Sweet*
                                           Benjamin J. Sweet
                                           ben@nshmlaw.com
                                           **NYE, STIRLING, HALE, MILLER, &
                                           SWEET LLP**
                                           101 Pennsylvania Boulevard, Suite 2
                                           Pittsburgh, Pennsylvania 15228
                                           Phone: (412) 857-5350

Jonathan D. Miller
jonathan@nshmlaw.com
**NYE, STIRLING, HALE, MILLER, & SWEET LLP**
33 W. Mission Street, Suite 201
Santa Barbara, California 93101
Phone: (805) 963-2345

*Attorneys for Plaintiffs*